



FILED
Mar 12 2024, 9:19 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N T H E

# Court of Appeals of Indiana

Kenneth E. Bardonner,

*Appellant-Respondent*

v.

Veronika Bardonner,

*Appellee-Petitioner*

March 12, 2024

Court of Appeals Case No.
23A-DC-1393

Appeal from the Monroe Circuit Court

The Honorable Catherine B. Stafford, Judge

Trial Court Cause No.
53C04-1504-DR-192

**Opinion by Judge Mathias**
Judges Tavitas and Weissmann concur.

**Mathias, Judge.**

[1] Kenneth Bardonner ("Father") appeals the trial court's order modifying his parenting time with his child, K.V.B. ("Child"). Father presents two issues for our review:

> 1. Whether the trial court's order prohibiting Father from taking Child to church services or church-related events violates his rights under the First Amendment to the United States Constitution or is otherwise erroneous.
>
> 2. Whether the trial court clearly erred when it modified his parenting time with Child.

[2] We affirm.

## Facts and Procedural History

[3] Father and Veronika Bardonner were married, and they had two Children together, Child and W.B. (collectively "the Children"), who were born February 12, 2011. In April 2015, Mother filed a petition for dissolution of the marriage. While that petition was pending, Father underwent a psychological evaluation with Dr. Jennifer Spencer, and she filed her report with the trial court.

[4] Dr. Spencer "diagnosed Father as having narcissistic personality and exhibitionism disorders. She was concerned about Father's inappropriate sexual boundaries, his attitudes toward women, his self-focus, and his lack of empathy." Appellant's App. Vol. 2, p. 72. "Based on these concerns, . . . [the trial] Court had encouraged Father to seek counseling to learn how to self-

monitor his thoughts and behaviors that could impact his children negatively. Father did not engage in the recommended counseling." *Id.* The trial court issued the dissolution decree in September 2016, awarding custody of the Children to Mother, with Father exercising parenting time.

At some point, W.B. died. In June 2017, Father filed a petition to modify custody of Child.[1] After a hearing on that petition and other pending motions, on May 22, 2018, the trial court issued an order denying Father's petition to modify custody. In particular, the court found as follows:

> 6. There has been no change in the conflictual nature of the relationship between Mother and Father. The Court's prior orders took this high conflict relationship into account by resting sole legal custody with Mother. . . . Father disregards Mother's legal authority to make decisions regarding religion and education and attempts to subvert it, going so far as to state that it is "his house, his rules." Father claims that Mother's actions demonstrate a pattern of harmful psychological conduct. However, Father has not demonstrated that Mother's decisions relative to legal custody or Father's parenting time have psychologically harmed [Child].
>
> 7. The actions of both parties continue to place [Child] in the middle of conflict. Mother must follow the orders of the Court and seek input from Father, in writing if desired, on matters concerning education, religion, and health care. Father must respect the legal authority of Mother, particularly on matters of religion, and strictly abide by the parenting time schedule and Mother's decisions.

---

[1] Father has not included a copy of that petition in his appendix on appeal. And neither party has stated the date of W.B.'s death in their briefs on appeal. For purposes of this appeal, we assume that Father's 2017 petition related only to Child.

\* \* \*

> [8c.] *Father will not bring [Child] to church services at All Saints Church. Father may bring [Child] to social activities only when church teachings are not the focus of the activity.*

*Id.* at 91 (emphasis added).

Thereafter, Father filed additional petitions to modify custody. In August 2020, the trial court issued an order on all pending motions and denied Father's then-pending petition to modify custody. And the court granted Mother's "request to have sole decision-making authority" for Child. *Id.* at 105. The court noted that Father had not complied with court-ordered therapy, having only attended "a few sessions" in two years. *Id.* The court found that "the fewer exchanges that the Parties have to negotiate, the better" and modified parenting time "so that Father has four consecutive days followed by Mother having seven consecutive days." *Id.*

In January 2022, Father filed another petition to modify parenting time. Mother filed a motion for rule to show cause why Father should not be found in contempt.[2] The trial court appointed a Guardian ad Litem ("GAL") for Child, and she filed three reports with the trial court in 2022. On September 16, the

---

[2] The trial court found Father in contempt for violating multiple court orders, and he does not appeal either those findings or the sanctions imposed.

trial court entered an interim order pending a final hearing on the motions. In that order, the trial court found and concluded in relevant part as follows:

> 8. Father is emotionally harming the child by putting implicit and explicit pressure on him to "fix" the parenting time[ schedule.]
>
> * * *
>
> 16. Father shall attend counseling with a licensed therapist approved by all parties, including the GAL. He shall propose a name to the other parties within one (1) week of this order. If the parties cannot agree on a therapist, any party may request an expedited hearing. Father's Counsel shall provide the therapist with a copy of the June 1, 2022, and the August 22, 2022, GAL reports.
>
> 17. Mother shall continue to participate in counseling as described in the June 1, 2022, GAL Report.
>
> 18. The parents shall ensure that the child continues in counseling and that he is assured of confidentiality in his counseling. . . . The purpose of therapy for the child is not to influence or change the court case or the parenting time schedule in any way. It is not the child's responsibility to "fix" the parenting time schedule.
>
> 19. Father shall NOT permit the child to attend any All Saints Orthodox Church event or any other event where members of that church are in attendance.
>
> * * *
>
> 22. It is in the child's best interests to modify parenting time to limit Father's time with the child so as to minimize the emotion[al] harm and to provide a more consistent and predictable schedule.

> 23. Father shall have interim parenting time every other weekend and midweek parenting time on alternate Tuesdays and Thursdays, as shown on the attached Exhibit A, Parenting Time Calendar for September, October, and November 2022, which is hereby incorporated into this Order. . . .

*Id.* at 128-30.

[8] A hearing on all pending motions was held beginning in November 2022 and concluded in February 2023. In March, the parties disagreed regarding parenting time over Child's spring break, and Father moved the court to allow him to take Child on a vacation. The trial court denied Father's motion, as well as his motion to reconsider.[3]

[9] On May 23, the trial court issued its order with the following relevant findings and conclusions:

> 19. A summary of the GAL's recommendations is as follows:
>
>> A. Father's parenting time to continue per the Interim Order, year[-]round, with no extended summer parenting time, and with holiday parenting time being limited to three overnights per holiday. This reduction of parenting time is based upon the emotional harm [Child] experiences by Father's implicit and explicit pressure about "fixing" the parenting time schedule and the mature themes to

---

[3] Father appeals the court's denial of that motion to reconsider. But we do not address that issue on appeal. We cannot offer Father relief from the court's denial of visitation for a vacation that was in March 2023, and the issue is moot.

which Father has been exposing [Child]. Father's parenting time should remain reduced until these issues are resolved.

B. Father to attend counseling with a qualified counselor approved by Mother's counsel, with the counselor to receive the GAL's reports and any other relevant information. Father's counseling should address his contempt for Mother, his beliefs about women, his beliefs about the divorce, . . . compliance with court orders, and self-monitoring of sexual thoughts and behaviors so that he is not impacting [Child] with these beliefs.

C. Mother to continue in counseling, addressing her feelings toward Father so that [Child] can feel safe to speak about Father in her presence and feel comfortable voicing his opinions, without recourse.

* * *

E. Both parents to address in their own counseling what they can do to help [Child] understand that he is not responsible for fixing the parenting time schedule or anything else about this proceeding.

F. [Child] should not be permitted to attend any function or event of All Saints Orthodox Church, based upon Father's abuse of the discretion afforded to him in the 2018 order that has required [Child] to lie to protect Father.

* * *

26. Wishes of the Parents.

A. Mother wishes Father to have parenting time with [Child] that is analogous to the Indiana Parenting Time Guidelines, but which is limited to no more than three consecutive overnights.

B. Father wishes the parents to have equal parenting time with [Child]—which would necessitate a modification from Mother's primary physical custody to joint physical custody.

27. Wishes of the Child.

A. The GAL observed [Child] become visibly uncomfortable when Father made comments about Mother during the home visit.

B. Based on the prior in camera interview and related findings of this Court, and the GAL's reported observations, [Child] continues to feel responsible for the Court's orders and the amount of parenting time Father receives. [Child] has expressed significant distress to the Court and the GAL about his perceived responsibility.

C. [Child] has expressed that he needs to keep his two worlds separate. When with Mother, he does not talk about Father. When with Father, he does not want to talk about Mother. He agrees with whichever parent he is with to avoid confrontation. The GAL observed [Child]'s ability to completely change his demeanor depending on who he was with.

* * *

28. Interaction and Interrelationship of the Child with Parents, Siblings, and Others.

A. [Child] has a close and loving relationship with . . . Mother and Father. However, [Child] is under pressure from Father to act in accordance with Father's suspicions of Mother to the point that [Child] has an almost obsession with keeping his two selves separate—he has one self at Mother's and one self at Father's.

B. The GAL expressed serious and repeated concerns that Father was speaking to [Child] about the court proceedings and the GAL reports. The GAL was so concerned about her meeting with [Child] on November 3, 2022, that she stated, "This GAL is very concerned about [Child's] mental health and wellbeing. It appears that [Child] is being pressured to change his opinion with this GAL. [Child] struggled so much during the November 3 meeting with this GAL. This GAL finds it unlikely that [Child] came to the conclusion on his own that he was being "cowardice" [sic] by not telling this GAL that he wanted more time with Father."

C. Father repeatedly emailed Mother with alleged statistics about the problems faced by children of divorce, memes about things such as, "You can't fix yourself by breaking someone else," and assertions such as, "A Child in a female-headed home is 10 times more likely to be beaten or murdered. (The Legal Beagle, July 1984, from "The Garbage Generation")."

* * *

G. Both parties acknowledge that [Child] was baptized in the Episcopalian church as an infant.

H. A prior order issued May 22, 2018, prohibited Father from taking [Child] to church services at his church, the All Saints Orthodox Church. Father was allowed to take [Child] to church functions that did not involve the church's teachings.

I. Father has consistently disregarded the May 22, 2018, order. Father's own witnesses confirmed that [Child] has regularly attended All Saints Orthodox Church services with Father. [Child] was identified by multiple witnesses of Father's as a "catechumen," a person preparing for baptism in the church. One of Father's witnesses reported that Father and [Child] were on the list read by the priest of people who hope to be baptized in the church and had been on that list for 4 months or more.

J. Father's picture (with [Child] in the photo and identified in the caption) appears in the All Saints directory from 2020.

K. Upon discovery of Father's violations, this Court's September 16, 2022, Interim Order further restricted Father from permitting [Child] to attend any All Saints Orthodox Church event or any other event where members of the church were in attendance.

L. Father's own witnesses confirmed [Child]'s continued presence at All Saints church after the Interim Order.

M. Father believes that since Mother was raised in the Russian Orthodox church that he should be able to provide to [Child] any similar church teachings.

N. Mother is opposed to [Child]'s participation with All Saints Orthodox Church for multiple reasons. . . .

O. Father alleges that this Court's restrictions regarding All Saints Orthodox Church violate his constitutional rights. . . .

30. Mental and Physical Health of the Parties and Child.

A. The GAL reports as follows:

[Child] has deeply internalized Father's beliefs and that this is creating conflict for [Child]. [Child] is very clearly stuck in the middle of his parents. [Child] has a deeply ingrained desire to avoid conflict. He does this by adopting his mom's side when he is with his mom and adopting his dad's side when he is with his dad. This GAL notes that [Child] acted noticeably different during the home visits. Both parents reported that [Child] was not acting significantly different than normal during the home visit.

*GAL Report, June 1, 2022, page 18.*

* * *

W. Mother and Father reside just less than two blocks from each other, in the same neighborhood.

X. Father placed multiple "Free [child's first name]" signs on trees up and down Mother's street. The signs were printed on white paper in large, bold, capital lettering. The signs were clearly visible from the windows of Mother's home, within [Child]'s view. The Court notes that this is at least the second time that Father has involved others in the neighborhood in his conflict with Mother, having previously sent emails to neighbors about Mother's alleged parental alienation.

Y. Mother immediately filed a petition for rule to show cause and a request for emergency orders restraining Father from displaying the signs. On January 20, 2022, this Court issued an order directing Father to remove all signs, including those within his own home, to refrain from posting any additional signs, and to refrain from disparaging Mother to [Child] or in [Child]'s presence.

Z. Despite the January 20, 2022, order, at the time of the GAL's home Visit in April 2022, Father had a "Free [redacted]" sign laying on his stairs, in plain sight. Father admits that he discussed the signs with [Child] the first time he had him after the signs had been posted and that they have talked about them whenever the subject comes up. Father believes [Child] was amused by the signs. Father is incorrect.

* * *

FF. Father defends his practice of sharing information with [Child] about these proceedings and the court system/conflict with Mother, in general. Throughout this proceeding, and before, Father has shared with [Child] content that is objectively inappropriate. This content has included articles about fatherless children, the movie *Kramer vs. Kramer*, and an episode of Dateline depicting a high conflict custody battle which ended with the mother killing the father. [Child] reported to the GAL that he watched *Kramer vs. Kramer*, "that it was depressing, and he didn't like it."

HH. Father demonstrates absolutely no recognition that his exposure of [Child] to this mature, parental conflict-related content is harmful. To the contrary,

Father believes it is appropriate and even beneficial to [Child].

* * *

38. Religious Activities of the Child

A. A child's legal custodian "may determine the child's upbringing, including the child's education, health care, and religious training." Ind. Code § 31-17-2-17(a)(2).

B. No party has petitioned to modify legal or physical custody.

C. As [Child]'s legal custodian, Mother has the sole authority to determine his religious training. Mother objects to [Child]'s exposure to All Saints Orthodox Church and to Father's participation in any religious training for [Child].

D. Restriction of Father's engagement in religious training for [Child] that violates Mother's legal custody rights is not a violation of Father's right to his own religious freedom of expression. Father is free to exercise his own religious practices, separately from [Child].

* * *

F. In this case, Father has gone beyond taking [Child] to extracurricular activities at his church. Father's own witnesses identified [Child] as a "catechumen" —a person preparing for baptism in the church. Father has invaded Mother's right to determine [Child]'s religious upbringing and has done so despite

earlier less restrictive orders, leading to the current order.

* * *

41. Parenting Time

A. Guidelines. This matter DOES involve allegations of family violence, substance abuse, and risk of flight with a child, or other circumstances that the Court reasonably believes would endanger the children's physical health or safety, or significantly impair the children's emotional development. Specifically, [Child] is emotionally endangered when Father puts him—personally and publicly—in the middle of Father's disputes with Mother. Thus, the Indiana Parenting Time Guidelines ("Guidelines") . . . are NOT in effect in this case except as specifically adopted, below.

* * *

C. Compliance with Prior Orders. Father has not yet complied with the August 2020 Order to complete "at least three months of no less than weekly therapy sessions with an appropriate therapist and . . . received a statement from the therapist that Father has done enough work so that he will not pose a burden on his son with respect to Mother."

D. [Child]'s Best Interests. The Court has carefully considered the statutory best interest factors as well as Father's constitutional rights to parenting time and [Child]'s strong relationship with Father and must balance those against the emotional harm that Father does to [Child] during parenting time in denigrating Mother, in exposing [Child] to the conflict between

the parents, and most seriously, in burdening [Child] with the responsibility for the parenting time schedule.

E. School Year Schedule. The Court adopts Section II(D)(1) of the Guidelines, for School Year Parenting Time, as follows:

> 1) Every other weekend: Father shall have parenting time every other weekend from after school on Friday to drop off at school on Monday. . . .

> 2) Midweek: Father shall have midweek parenting time with [Child] on the Thursdays prior to Mother's regular weekends from 5:00 pm to 8:00 pm, and on Tuesdays following Mother's regular weekends from 5:00 pm to 8:00 pm. Each week, Father and [Child] will have one midweek parenting time. . . .

* * *

H. All Saints Orthodox Church. Father shall NOT permit the child to attend any All Saints Orthodox Church service, Sunday school, social event, any event located at the church, any event sponsored in whole or in part by All Saints Orthodox Church; nor any private events hosted by a member of All Saints Orthodox Church. Father is not prohibited from taking [Child] to community events where other members of the All Saints Orthodox Church may happen to be in attendance.

*Id.* at 67-82. This appeal ensued.

# Discussion and Decision

## Standard of Review

Father appeals the trial court's order, which includes extensive findings and conclusions, following an evidentiary hearing. Our standard of review is well settled:

> The trial court entered findings of fact and conclusion of law in its order denying modification of custody. Pursuant to Indiana Trial Rule 52(A), the reviewing court will "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *D.C. v. J.A.C.*, 977 N.E.2d 951, 953 (Ind. 2012) (internal quotation and citations omitted). . . .

> Additionally, there is a well-established preference in Indiana "for granting latitude and deference to our trial judges in family law matters." *In re Marriage of Richardson*, 622 N.E.2d 178 (Ind. 1993). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quoting *Brickley v. Brickley*, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). "On appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Id.* "Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment." *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011) (citations omitted).

*Steele-Giri v. Steele*, 51 N.E.3d 119, 123-24 (Ind. 2016).

**Issue One: Child's Religious Training**

Father first contends that the trial court's order prohibiting Child's attendance at Father's church or at any church-related activity violates his "Federal and State First Amendment constitutional rights."[4] Appellant's Br. at 31. In particular, he asserts that *his* "religious freedom and freedom of association is infringed when he is forced by the trial court to choose between involving his child in his church community or face having his access to his son stripped." *Id.* We do not agree.

The First Amendment to the United States Constitution provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" In support of his argument on appeal, Father cites *Israel v. Israel*, 189 N.E.3d 170 (Ind. Ct. App. 2022), *trans. denied*. In *Israel*, a father argued that a non-disparagement clause in the trial court's dissolution decree was an unconstitutional prior restraint of his speech. That clause prohibited both parents from disparaging the other in front of their child or to "anyone." *Id.* at 175. On appeal, we held that the prohibition did not violate the father's constitutional rights with respect to statements he made in the presence of his child given the "compelling government interest 'in

[4] Father makes no separate argument under the Indiana Constitution. Accordingly, we address only his argument under the First Amendment to the United States Constitution.

protecting children from being exposed to disparagement between their parents.'" *Id.* at 180. But we held that the clause went "far beyond furthering that compelling interest to the extent it prohibits the parents from 'making disparaging comments' about the other in the presence of 'anyone' even when Child is not present." *Id.*

[13] Father's reliance on *Israel* is misplaced. In *Israel*, the First Amendment violation was based on a prohibition of the father's freedom of speech. Here, in contrast, the trial court has not restricted Father's First Amendment freedom of religion in any way.

[14] Moreover, as Father acknowledges, Indiana Code section 31-17-2-17 grants a custodial parent the right to "determine [a] child's upbringing, including the child's education, health care, and *religious training*." (Emphasis added.) The statute further provides that a court may only limit the custodian's authority upon a determination that, "in the absence of a specific limitation" of that authority, the child's physical health would be endangered or his emotional development would be significantly impaired. *Id.* Here, Father has made no such showing, and Mother's right to determine Child's religious training is therefore without limit, which includes her right to exclude Father's religious preferences.

[15] Still, in addition to the alleged First Amendment violation, Father contends that the court's order unfairly restricts Child's extra-curricular activities and that Mother should not be "permitted to use religion as a weapon in order to dictate

where Father and [Child] can go and with whom they can associate, when there is both no demonstrated interference with Mother's religious training and no demonstrated harm to [Child]." Appellant's Br. at 29. But Father's arguments amount to a request that we reweigh the evidence, which we will not do on appeal. The bottom line is that Mother *has the exclusive authority* to dictate Child's religious training, and she has decided that Child shall not participate in Father's church. Mother does not need to explain her reasons or justify her decision in any way.

[16] Finally, we note that it was Father's own violations of previous court orders, which were less restrictive on this issue, that led the trial court to impose the current prohibition against taking Child to even private functions hosted by members of Father's church. Given the trial court's broad discretion in family matters, we decline Father's invitation to find an abuse of that discretion here.

[17] In sum, the trial court's order does not violate Father's First Amendment rights; nor is it erroneous for other reasons.

**Issue Two: Parenting Time**

[18] Father next contends that the trial court abused its discretion when it modified his parenting time, including a reduction in his summer parenting time to less than that recommended under the Parenting Time Guidelines. Father argues that the court's order is "arbitrary, capricious and is not reasonably related to any probable harm to [Child]." Appellant's Br. at 34. We do not agree.

[19] Indiana Code section 31-17-4-2 provides as follows:

The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child. However, the court shall not restrict a parent's parenting time rights unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development.

As this Court has explained,

Indiana recognizes that the right of a noncustodial parent to visit his or her children is a "precious privilege." *Duncan v. Duncan*, 843 N.E.2d 966, 969 (Ind. Ct. App. 2006), *trans. denied*. Thus, although a court may modify a parenting time order when the modification would serve the best interests of the child or children, a parent's visitation rights shall not be restricted unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development. *Id.* (citing Ind. Code § 31-17-4-2). Even though the statute uses the word "might," this Court has previously interpreted the language to mean that a court may not restrict parenting time unless that parenting time "would" endanger the child's physical health or emotional development. *See Stewart v. Stewart*, 521 N.E.2d 956, 960 n.3 (Ind. Ct. App. 1988), *trans. denied*. A party who seeks to restrict a parent's visitation rights bears the burden of presenting evidence justifying such a restriction. *Farrell v. Littell*, 790 N.E.2d 612, 616 (Ind. Ct. App. 2003).

*D.B. v. M.B.V.*, 913 N.E.2d 1271, 1274-75 (Ind. Ct. App. 2009).

[20] Here, the trial court concluded that

[t]his matter DOES involve allegations of family violence, substance abuse, and risk of flight with a child, or other circumstances that the Court reasonably believes would endanger

the children's physical health or safety, or significantly impair the children's emotional development. Specifically, [Child] is emotionally endangered when Father puts him—personally and publicly—in the middle of Father's disputes with Mother. Thus, the Indiana Parenting Time Guidelines ("Guidelines") . . . are NOT in effect in this case except as specifically adopted, below.

Appellant's App. Vol. 2, p. 81. In support, and as excerpted above, the trial court found *multiple* examples of Father's conduct that harmed Child, especially "in exposing [Child] to the conflict between the parents[.]" *Id.* And our review of the record shows that the court's assessment is well supported. Thus, the court's restriction of parenting time to less than that recommended under the Guidelines was not an abuse of discretion. Father's contention on appeal amounts to a request that we reweigh the evidence, which we will not do.

## Conclusion

[21] The trial court's order prohibiting Child's involvement in certain activities related to Father's church does not violate Father's First Amendment rights. Nor is it otherwise erroneous. Further, the trial court's order modifying Father's parenting time is supported by the evidence and is not clearly erroneous.

[22] Affirmed.

Tavitas, J., and Weissmann, J., concur.

ATTORNEY FOR APPELLANT

Cassandra A. Kruse
Emswiller, Williams, Noland & Clarke, LLC
Indianapolis, Indiana


ATTORNEY FOR APPELLEE

Kendra G. Gjerdingen
Mallor Grodner LLP
Bloomington, Indiana